NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| YUKO YAMAMOTO,<br><br>Plaintiff,<br><br>v.<br><br>PANASONIC CORPORATION OF NORTH AMERICA,<br><br>Defendant. | Civil Action No. 12-2352 (JLL)<br><br>OPINION |

**LINARES**, District Judge.

This matter comes before the Court by way of Defendant Pansonic Corporation of North America ("Defendant" or "Panasonic")'s motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The Court has considered the submissions made in support of and in opposition to Defendant's motion, and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, Defendant's motion is granted in part, and denied in part.

**I.     BACKGROUND**[1]

This action arises from Defendant's allegedly wrongful termination of Plaintiff Yuko Yamamoto ("Plaintiff" or "Yamamoto")'s employment. On April 20, 2012, Plaintiff filed a two-count complaint alleging that Defendant, her former employer, committed interference and retaliation violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*

---

[1] Unless otherwise noted, the facts set forth herein are deemed to be undisputed for the purpose of deciding this motion. It bears mentioning that Defendant did not furnish a response to Plaintiff's supplemental statement of material facts pursuant to Local Civil Rule 56.1. Accordingly, the Court has deemed the assertions in Plaintiff's supplemental statement to be undisputed. *See* Loc. Civ. R. 56.1.

1

and the New Jersey Family Leave Act ("NJFLA"), N.J.S.A. § 34:11B-1 *et seq.* On May 10, 2013, Panasonic moved for summary judgment as to both counts in Plaintiff's complaint.

A. General Background Concerning Plaintiff's Employment at Panasonic

Plaintiff Yuko Yamamoto ("Plaintiff" or "Yamamoto") began her employment with Panasonic in July 1998, working out of Panasonic's headquarters in Secaucus, New Jersey. (*See* Def. Stmt. Undisputed Mat. Facts ("SUMF") at ¶ 1.) Throughout her nearly 14-year tenure at Panasonic, Plaintiff worked as an executive assistant to high-level executives and received overtime compensation for hours worked in excess of 35 hours. (*Id.* at ¶¶ 1-5, 6.) Between March 2010 until the termination of her employment in March 2012, Plaintiff worked as the executive assistant of Shiro Kitajima ("Kitajima"), President of Panasonic's Consumer Electric Company and later President of Panasonic Marketing North America. (*Id.* at ¶ 4.)

Throughout the course of her employment, Plaintiff received annual performance appraisals reflecting her supervisors' satisfaction with her work. (Def. SUMF at ¶¶ 7-8; Pl. SUMF at ¶ 17.) Indeed, in her last full evaluation, Kitajima rated Plaintiff as exceeding expectations, and described her as being "fair and honest in all business dealings and in personal conduct." (Def. SUMF at ¶ 8.) Plaintiff also "received regular increases in compensation" based on her work performance. (Def. SUMF at ¶ 9; Pl. SUMF at ¶ 18.)

B. Plaintiff's Time Away from Work

While employed at Panasonic, Plaintiff took time off of work on numerous occasions to attend either to her own medical condition or that of a close family member.

a. Plaintiff's First Leave of Absence – August 1999

In 1999, Plaintiff's mother became ill, and Plaintiff learned that she had "the right to take

some time off to care for a sick family member." (Def. SUMF at ¶ 11.) At this time, Panasonic provided Plaintiff "with a booklet which explained its leave policies." (*Id.* at ¶ 12.) This booklet "explained how an employee should request FMLA leave because of her own 'serious health condition' . . . or to care for the 'serious health condition of the employee's parents.'" (*Id.* at ¶ 14.) It "also explained that an employee must provide a Medical Certification Form to the Company in order for a leave request to be approved and that the leave would be unpaid." (*Id.* at ¶ 15.) Finally, "the booklet explained that upon returning from family and medical leave, the employee will normally be restored to his or her . . . position, absent certain circumstances." (*Id.* at ¶ 16.)

In accordance with the booklet's instruction, Plaintiff "completed an Employee Request for Leave form and submitted it to Human Resources so that she could take . . . leave to care for her ill mother in Japan." (*Id.* at ¶ 17.) Thereafter, Panasonic approved Plaintiff's leave request. (*Id.* at ¶ 18.) Plaintiff commenced her leave on August 2, 1999 and returned to work the following week, on August 9. (*Id.*) When she returned to work, Plaintiff "returned to her same position." (*Id.* at ¶ 19.)

b. Plaintiff's Second Leave of Absence – May 2003

In 2003, Plaintiff sought leave to attend to a medical condition. (*Id.* at ¶ 21.) "As she had with her leave in 1999, [Plaintiff] completed and submitted an Employee Request for Leave Form, and she arranged for her doctor to submit the required Certificate of Health Care Provider." (*Id.* at ¶ 22.) Panasonic approved Plaintiff's request for leave, and Plaintiff "was away from work from May 5 to June 2, 2003." (*Id.* at ¶ 23.) Upon her return to work, Plaintiff was restored to her same position and all "the terms and conditions of her employment remained the same." (*Id.* at ¶ 24.)

3

### c. Plaintiff's Third Leave of Absence – November 2003

Plaintiff sought a third leave of absence in 2003 to have surgery to correct a medical condition. (*Id.* at ¶ 25.) "She completed and submitted an Employee Request for Leave Form and arranged for her physician to submit the Certificate of Health Care Provider." (*Id.* at ¶ 26.) Panasonic approved Plaintiff's request for leave, and Plaintiff was "out of work from November 7 to December 9, 2003." (*Id.* at ¶ 27.) When she returned to work, Plaintiff was again restored "to her same position without any changes." (*Id.* at ¶ 28.)

### d. Plaintiff's Fourth Leave of Absence – June 2010

In 2010, Plaintiff sought leave to have surgery in Japan. (*Id.* at ¶ 29.) Again, she "completed and submitted a Certification of Health Care Provider for Employee's Serious Health Condition." (*Id.* at ¶ 30.) According to Panasonic, Human Resources Manager Ken Portington ("Portington") approved Plaintiff's request for leave. (*Id.* at ¶ 31.) Plaintiff disputes this fact, and asserts that Plaintiff "dealt solely with [Human Resources Representative] Marisol Rivera about taking FMLA leave in June 2010." (*See* Pl. Resp. SUMF at ¶ 31.) Specifically, Plaintiff maintains that "the approval and processing of [her] June 2010 leave was solely through Rivera." (*Id.*)

Plaintiff began her leave on June 10, 2010; when her leave expired in September 2010, Portington approved Plaintiff's request for a one month extension. (Def. SUMF at ¶¶ 32-33.) Plaintiff ultimately returned to work in October 2010, at which point she was restored "to her same position supporting Kitajima and did not suffer any adverse employment action." (*Id.* at ¶ 35.)

### e. Plaintiff's Trip to Japan – August 2011

In August 2011, Plaintiff informed Portington and Kitajima that she wished to travel to Japan to visit her father, who was suffering from gastric cancer and was not recovering well from a recent operation. (Def. SUMF at ¶ 36; Pl. SUMF at ¶¶ 47-48.) Kitajima permitted Plaintiff to travel to Japan to care for her ailing father, and suggested that she attend a company training session being held there in August. (Def. SUMF at ¶¶ 36-37; Pl. SUMF at ¶ 49.)

In an email dated August 12, 2011, Portington asked Plaintiff whether she would be using vacation time for the period during which she would miss work, and explained that "'[t]here is a provision in family leave to take time off to take care of a family member.'" (Def. SUMF at ¶ 42.) Portington added that to qualify for family leave, Plaintiff would have to "fill out a request for leave paperwork." (*Id.* at ¶ 43.) In response to Portington's email, Plaintiff stated "that she 'had enough times [sic] with personal and vacation combined and therefore did not require family leave.'" (*Id.* at ¶ 44.)

Plaintiff traveled to Japan from August 12, 2011 until September 26, 2011. (Def. SUMF at ¶¶ 38, 46; Pl. SUMF at ¶ 50.) Panasonic paid for Plaintiff's round-trip airfare for this visit. (Def. SUMF at ¶ 45.) While in Japan, Plaintiff attended the training session that Kitajima suggested she attend. (*Id.* at ¶ 45.) According to Plaintiff's unrefuted Statement of Material Facts, she also performed 20-55 hours of work per week during her 2011 visit to Japan without incident. (*See* Pl. SUMF at ¶¶ 95-102; *see also* Resp. SUMF at ¶ 45.)

Upon her return from Japan, Plaintiff worked "in the same position, supporting Kitajima." (Def. SUMF at ¶ 46.)

    f. <u>Plaintiff's Fifth Leave of Absence – January 2012</u>

On January 19, 2012 Plaintiff once again traveled to Japan to care for her ailing father. (Def. SUMF at ¶ 49.) Prior to her departure, Plaintiff informed Kitajima that "there was a

5

medical emergency with her father." (Pl. SUMF at ¶ 54.) Kitajima then told Plaintiff to "'[g]o [to Japan] right away.'" (Def. SUMF at ¶ 50).

Yamamoto told Portington "that she would be using vacation time while she was away." (Def. SUMF at ¶ 51; Resp. SUMF at ¶ 51.) It is disputed, however, whether Plaintiff worked on a reduced schedule in January and February of 2012. (Pl. Resp. SUMF at ¶ 51.) Specifically, Plaintiff maintains that between January 2012 and February 2012, she: (1) "responded to and sent work-related emails;" (2) reviewed Kitajima's emails, temporary files, and her own email correspondence as she was expected to do during her leave; (3) coordinated Kitajima's travel itinerary; (4) "received, sent, and reviewed corporate communications via Blackberry as part of her job 'all the time' during her leave;" and (5) coordinated "about matters relating to Kitajima's secretary located in Japan." (*See* Pl. SUMF at ¶¶ 78-82.)

Although it is undisputed that Kitajima received secretarial help from other individuals during Plaintiff's 2012 trip to Japan, the extent to which these individuals entirely took on Plaintiff's responsibilities is in dispute, as Plaintiff contends that she continued providing support to Kitajima while in Japan. (*See* SUMF at ¶ 52; Pl. Resp. SUMF at ¶¶ 52, 55.)

According to Panasonic, in mid-February 2012, "Portington asked Kitajima about [Plaintiff's] status and how many vacation days she had left." (Def. SUMF at ¶ 73.) Plaintiff disputes this fact on the basis that Portington testified during his deposition that "he had no responsibilities to track payroll, vacation or any type of pay for any of the 600 employees [for whom he was responsible], including Yamamoto." (Pl. Resp. SUMF at ¶ 73.) Additionally, Plaintiff maintains that Portington had no reason to expect that Kitajima would be tracking Plaintiff's vacation time because "it was well known [that] Kitajima didn't track vacation pay for employees as the President of [Panasonic]." (Pl. Resp. SUMF at ¶ 73.)

6

At his deposition, Portington testified that as a result of his mid-February conversation with Kitajima, he "learned for the first time that Kitajima had not approved Yamamoto's vacation days in the time management system; rather she did." (Def. SUMF at ¶ 75.) Portington also testified that he reviewed Plaintiff's timecards and thus confirmed that she "had been recording a substantial number of hours she claimed to have worked while in Japan." (Id. at ¶ 78.)

According to Portington, he and Kitajima spoke about Plaintiff's timecard submissions, and Kitajima was "shocked and surprised [to learn] about . . . the amount [sic] of hours she [i.e., Plaintiff] had put in." (Id. at ¶ 79.) Portington maintains that he and Kitajima ultimately "concluded that Yamamoto recorded hours for work she had not been asked to perform and was recording time that she should not have been recording." (Id. at ¶ 81.)[2] Plaintiff, on the other hand, asserts that no superior ever told her that she could not work while in Japan or enter time for which she worked while in Japan. (Pl. SUMF at ¶¶ 96, 104.) Plaintiff further asserts that Defendant "has no policy prohibiting work during a medical leave of absence by employees." (Id. at ¶ 103.)

In an email dated February 27, 2012, Portington instructed Plaintiff "to cease performing any work and to complete and submit the required FMLA paperwork." (Def. SUMF at ¶ 82.) Portington attached the documentation required for FMLA leave to this email; this was the first time that any such documentation had been provided to Plaintiff in connection with this particular leave. (Id.; Pl. Resp. SUMF at ¶ 82 n.7.) On March 2, 2012, Plaintiff "returned the completed Employee Request for Leave Form" to Panasonic. (Def. SUMF at ¶ 84.) She later

---

[2] Plaintiff disputes that Portington and Kitajima actually reached this conclusion. She maintains that this conclusion is untenable because while she "normally worked 65-75 hours every week to make sure every need of the President [i.e., Kitajima] was supported," she worked only 13.5, 35, 17, and six hours, respectively, during four out of the eight weeks of her FMLA leave. (Pl. Resp. SUMF at ¶ 79.)

7

returned the completed Certification of Health Care Provider for Family Member's Serious Health Condition on March 8, 2012. (Def. SUMF at ¶ 85.) According to Panasonic, Portington subsequently "approved Yamamoto's request for FMLA leave, and the leave commenced on February 27, 2012." (*Id.* at ¶ 86.) Plaintiff disputes that her FMLA commenced on February 27, 2012, and asserts that it actually commenced on January 19, 2012. (Pl. Resp. SUMF at ¶ 86.)

In her unrefuted Statement of Material Facts, Plaintiff asserts that Kitajima continued to assign her work even after February 27, 2012, the date on which she had been instructed to cease working. (Pl. SUMF at ¶¶ 87-94.) Plaintiff completed this work, yet was never compensated. (Pl. SUMF at ¶ 92.) This work included compiling information for Kitajima to file his income tax returns and making travel arrangements for Kitajima and his family. (Pl. SUMF at ¶ 90-91.)

By late February, Kitajima purportedly ceased all communications with Plaintiff. (Pl. SUMF at ¶ 105-06.) Plaintiff claims that as a result of this lack of communication with her boss, she "felt compelled to return [from Japan] a little earlier than expected." (Pl. SUMF at ¶ 106.) In an email dated March 7, 2012, "Yamamoto advised Portington that '[i]f all goes well, [she] can be back in the office ... [on] March 16." (Def. SUMF at ¶ 87.) "Portington responded that Kitajima would be out of the office that day, and he asked Yamamoto to see him 'first thing' that morning." (*Id.* at ¶ 88.) Portington testified that the reason he wanted to see Yamamoto was "'to tell her that we [i.e., he and Kitajima] had thought she had falsified her time cards and that it was a terminable offense.'" (*Id.* at ¶ 89.)

C. Panasonic's Termination of Plaintiff's Employment

Plaintiff met with Portington upon her return to work the morning of March 16, 2012. (Def. SUMF at ¶ 91; Pl. SUMF at ¶ 108.) At this meeting, Portington told Plaintiff that he was "disappointed to see that [she] had worked, that [she] claimed time while [she] was in Japan."

8

(Def. SUMF at ¶ 92.) "Yamamoto impressed upon Portington during the March 16 meeting [that] she worked every hour she put in payroll for January – February 2012, and Portington told Yamamoto he believed that and was recommending she be paid 3 months of pay as part of her separation" in exchange for a release of potential claims. (*See* Pl. SUMF at ¶¶ 109, 126.) Plaintiff also claims that during this meeting Portington asked her whether she would remain concerned about her father's health in later months. (Pl. SUMF at ¶ 111.)

Ultimately, Portington gave Plaintiff the option of resigning at the end of March, or proving that she actually worked. (Def. SUMF at ¶ 96, citing Yamamoto Depos. 140:19-23.)[3] "Portington explained that if Yamamoto chose the second option and failed to show that she had worked, then she would 'be terminated right away.'" (*Id.* at ¶ 97.) "Portington asked Yamamoto to '[g]et back to [h]im by Monday and let [him] know which option [she would] take.'" (*Id.* at ¶ 98.) "Yamamoto subsequently called Portington and told him that she 'will take the option to prove [herself] and not resign.'" (*Id.* at ¶ 99.)

On March 18, 2012, Plaintiff met with Kitajima, who told her that he trusted her and believed her representation that she worked while in Japan. (Pl. SUMF at ¶ 116.)

On March 20, 2012, Plaintiff had a second meeting with Portington. (Def. SUMF at ¶ 100.) Before this meeting, Plaintiff sent Portington "an e-mail with a letter and summary prepared for the purpose of showing [him] the work she claimed to have performed on particular days while in Japan." (*Id.* at ¶ 101.) In that letter, Plaintiff wrote that "she 'was not asked to work directly from [sic] Mr. Kitajima,' but explained that she 'was asked by . . . Mr. Kitajima's interim assistant to provide help.'" (*Id.* at ¶ 102.) According to Plaintiff, while Kitajima may not have directly ordered her to perform certain work, "the work she was doing was directed to

---

[3] In Plaintiff's Responsive 56.1 Statement, she denies this fact. Nevertheless, both Plaintiff and Portington acknowledged this fact during their respective depositions. Accordingly, the Court construes this fact as undisputed.

9

be done by Kitajima" who was, himself, aware of the fact she was working. (Def. Resp. SUMF at ¶ 102.)

"At the [March 20] meeting itself, Yamamoto provided Portington with a collection of e-mails that she claimed further supported the work for which she entered time while she had been away in Japan." (Def. SUMF at ¶ 104.) Portington reviewed Plaintiff's summary of the work she purportedly performed "'line by line' and asked her questions about her claimed time." (*Id.* at ¶ 105.) In multiple instances, "Portington asked Yamamoto about entries on her summary and why it took her 'so long' to perform the task that she described." (*Id.* at ¶ 106.) "Portington made a number of hand-written notes on Yamamoto's summary during his meeting with her." (*Id.* at 108.) According to Plaintiff's unrefuted Statement of Material Facts, "[a]t the end of the meeting on March 20, 2012, Portington explicitly stated he believed Yamamoto worked every hour she identified in payroll." (Pl. SUMF at ¶ 121.) Portington purportedly told Plaintiff "that he was going to speak with Kitajima, and . . . would get back to her." (*Id.* at ¶ 109.)

Portington claims that he "proceeded to speak again with Kitajima (as well as [Panasonic's] in-house counsel) and reviewed the work that Yamamoto claimed to have done while in Japan." (Def. SUMF at ¶ 114.) Plaintiff disputes this assertion, in part, on the grounds that Kitajima testified that (1) "he never suggested any type of investigation of Yamamoto take place," and (2) "Portington never showed Kitajima the hundreds of e-mail[s] Yamamoto provided or told him about them." (Resp. SUMF at ¶ 114.) Nevertheless, Plaintiff does not specifically dispute that Kitajima and Portington had a discussion about Plaintiff's timesheets.

10

(*See id.*)[4] After they consulted, Kitajima told Portington that "he could no longer trust her in the position." (Def. SUMF at ¶ 117.)

On March 21, 2012, Portington called Yamamoto and informed her of the decision to terminate her employment. (Def. SUMF at ¶ 120.) During his deposition, Portington acknowledged that Yamamoto had performed some work in Japan, but maintained that she exaggerated the amount of time she claimed to have worked. (*See id.* at ¶ 118.) By contrast, during her deposition, Plaintiff testified that Portington advised her that her employment would be terminated because of "a judgment and a trust issue," even though "they [presumably, he and Kitajima] believe that [she] worked the hours she did." (Yamamoto Depos. at 161:1-8; Pl. SUMF at ¶ 124.)

## II. LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). An issue is "'genuine' . . . if the evidence is such that a reasonable jury could find for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party must first demonstrate that there is no genuine issue of material fact in dispute, such that a grant of summary judgment would be appropriate. *See Celotex v. Catrett*, 477 U.S. 317, 325 (1986). To do so, "the moving party must show that the non-moving party has failed to establish one or more essential elements of its case on which the non-moving party has the burden of proof at trial." *McCabe v. Ernst & Young*, 494 F.3d 418, 424 (3d Cir. 2007). If the moving party satisfies this burden, the burden shifts to the non-moving party to point to sufficient evidence that creates genuine issues of disputed material fact "such that a reasonable

---

[4] Rather, Plaintiff appears to dispute only the assertion that Kitajima and Panasonic's in-house counsel reviewed the work Yamamoto claimed to have done. Accordingly, the Court construes as undisputed Panasonic's assertion that Portington and Kitajima consulted after the March 20, 2012 meeting.

jury could find in its favor." *Id.*; *see also Celotex*, 477 U.S. at 332. "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). In deciding whether there are any genuine issues of disputed material fact, courts must "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000). "Thus, if a reasonable fact finder could find in the nonmovant's favor, then summary judgment may not be granted." *Norfolk Southern Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 91 (3d Cir. 2008).

### III. DISCUSSION

Defendant argues that it is entitled to summary judgment on Yamamoto's FMLA and NJFLA retaliation and interference claims because: (1) "there is no evidence to support Yamamoto's claims that she was wrongfully terminated in retaliation for taking leave under the FMLA or NJFLA" and (2) "Yamamoto's interference claims are identical to her retaliation claims and should be dismissed." (CM/ECF No. 23-3 at 19, 25.)

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). The FMLA also provides that "any eligible employee who takes leave under [the FMLA] . . . shall be entitled, on return from such leave --- (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a). Employers may not

"interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a).

Under the NJFLA, an employee is entitled to "a family leave of 12 weeks in any 24-month period upon advance notice to the employer . . . [i]n the case of a family member who has a serious health condition." N.J.S.A. § 34:11B-4. Like the FMLA, the NJFLA also provides that an employee taking leave under the NJFLA is "entitled to be restored by the employer to the position held by the employee when the leave commenced or to an equivalent position of like seniority, status, employment benefits, pay, and other terms and conditions of employment." N.J.S.A. § 34:11B-7.

"Due to the similarity of the statutes, courts apply the same standards and framework to claims under the FMLA and the NJFLA." *Wolpert v. Abbott Labs.*, 817 F. Supp. 2d 424, 437 (D.N.J. 2011) (citing *Santosuosso v. NovaCare Rehabilitation*, 462 F. Supp. 2d 590, 596 (D.N.J. 2006)). Thus, this Court will address Plaintiff's interference and retaliation claims under the FMLA and the NJFLA together.[5]

### A. Whether Defendant is Entitled to Summary Judgment on Plaintiff's Retaliation Claims

"To establish a prima facie claim for retaliation under the FMLA and NJFLA, the plaintiff must demonstrate that: (1) she took a FMLA/NJFLA leave; (2) she suffered from an adverse employment decision; and (3) the adverse decision was causally related to her FMLA/NJFLA leave." *Truesdell v. Source One Personnel Inc.*, No. 07-1926, 2009 U.S. Dist. LEXIS 48703, at *14 (D.N.J. June 9, 2009) (citing *Santosuosso*, 462 F. Supp. 2d at 596) (citing *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004)).

Once a plaintiff establishes a prima facie retaliation claim under the FMLA and NJFLA,

---

[5] In her opposition brief, Plaintiff agrees that "claims under the [NJ]FLA and FMLA should be analyzed in the same manner." (CM/ECF No. 28 at 8.)

the claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Truesdell*, 2009 U.S. Dist. LEXIS 48703, at *14; *see also Colicchio v. Merck & Co.*, No. 080-3593, 2013 U.S. Dist. LEXIS 10029, at *2 (D.N.J. Jan. 25, 2013) (observing that "New Jersey courts use the *McDonnell Douglas* analysis to decide [NJ]FLA retaliation claims.") (citation omitted). Under this framework, a plaintiff must first establish a prima facie case by a preponderance of the evidence. *See McDonnell Douglas*, 411 U.S. at 802. The burden then shifts to the defendant to articulate "some legitimate, nondiscriminatory reason for" its actions. *Id.* If the defendant satisfies this burden, the plaintiff must then prove that the defendant's purportedly legitimate reason is merely a pretext for discrimination. *See id.* at 804-05. To do this, "the plaintiff must point to some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (applying *McDonnell Douglas* framework in employment discrimination case brought under Title VII).

In moving for summary judgment, Defendant "has assumed . . . that Yamamoto could establish a prima facie FMLA [and NJFLA] retaliation case." (CM/ECF No. 33 at 6.) In her opposition brief, Plaintiff does not dispute that Defendant has put forth a legitimate nondiscriminatory reason for terminating her employment, that is, the alleged falsification of timecards. Accordingly, this Court need address only whether there are any genuine issues of material fact as to whether Defendant used Plaintiff's alleged falsification of timecards as a pretext to actually terminate her for taking FMLA/NJFLA leave.

Defendant contends that "[t]he fact that: (1) Yamamoto took four previous FMLA leaves

of absence and one personal leave of absence without incident; (2) was actually promoted after taking three of her four prior FMLA leaves; and (3) Katajima proposed that Yamamoto take a leave of absence in 2011 to care for her ill father and arranged for [Panasonic] to pay for Yamamoto's round trip airfare to Japan, belies any argument of pretext." (CM/ECF No. 23-3 at 28.) Plaintiff, on the other hand, maintains that the following evidence, among other evidence in the record, suffices to create a triable issue as to whether Defendant's stated reasons for terminating her employment were pretextual:

- Plaintiff was never told she could not work while on FMLA leave;

- Defendant has no policy prohibiting an employee from working while on FMLA leave;

- Plaintiff worked during her 2011 visit to Japan without incident;

- Plaintiff was directed to work by her own management during her 2012 medical leave;

- Kitajima acknowledged knowing that Plaintiff was performing work for him during her 2012 medical leave;

- Neither Portington nor Kitajima could dispute that Plaintiff worked the hours she claimed to have worked;

- Portington had no valid basis to begin an investigation into Yamamoto's payroll as he had no responsibilities to track payroll, vacation or any type of pay for any of the 600 employees for whom he was responsible; and

- The temporal proximity between Plaintiff's return from FMLA leave and her termination.

(*See* CM/ECF No. 28 at 14-17.)

In its reply brief, Defendant goes to considerable lengths in making factual arguments as to why Plaintiff's evidence of pretext "does not show pretext." (*See* CM/ECF No. 33 at 2-10.) At this stage, however, the Court's function is not to determine whether Plaintiff's evidence of pretext *actually* shows pretext. Rather, the Court must determine whether the evidence in the

15

record can lead a reasonable trier of fact to conclude that Defendant's stated reasons for terminating Plaintiff's employment were pretextual. Construing all the facts in the light most favorable to Plaintiff compels the Court to answer this question in the affirmative. Accordingly, Defendant's motion for summary judgment as to Plaintiff's FMLA and NJFLA retaliation claims is denied.

      B.     <u>Whether Defendant is Entitled to Summary Judgment on Plaintiff's Interference Claims</u>

"To prevail on an FMLA interference claim, the employee merely needs to show she was entitled to benefits under the FMLA and that she was denied them." *Thurston v. Cherry Hill Triplex*, No. 06-3862, 2008 U.S. Dist. LEXIS 60936, at *11 (D.N.J. Aug. 5, 2008) (citing *Parker v. Hahnemann Univ. Hosp.*, 234 F. Supp. 2d 478, 485 (D.N.J. 2002)).

Defendant argues that this Court should grant summary judgment on Plaintiff's interference claims because they are premised on the same fact upon which her retaliation claims are based—that is, her allegedly wrongful termination. (*See* Compl. ¶ 38.) In response, Plaintiff argues that her interference claims should survive summary judgment because in terminating her employment, Defendant interfered with her "entitlement' to be reinstated to her same or similar job under the FMLA." (CM/ECF No. 28 at 21.)[6] Plaintiff relies on *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500 (3d Cir. 2009) for the apparent proposition that the act of terminating an

---

[6] In her opposition brief, Plaintiff also asserts five alleged FMLA interference violations that are unrelated to her termination, and are not pled in her complaint. (*See* CM/ECF No. 28 at 20-21.) The Court will disregard these alleged interference violations as they were never properly pled. *See, e.g., Johnson v. Cmty College of Allegheny Cty.*, 566 F. Supp. 2d 405, 449 (W.D. Pa. 2008) (refusing to consider claims of interference with FMLA rights that were raised for the first time in plaintiff's brief in opposition to summary judgment motion, and noting that raising such claims for the first time in an opposition brief is "procedurally inappropriate."); *see also Dogmanits v. Capital Blue Cross*, 413 F. Supp. 2d 452, 458 n.1 (E.D. Pa. 2005) (claims not properly pled in amended complaint deemed not to be before the court).

16

employee may amount both to interference and retaliation.[7]

In *Erdman*, the court held that an employee need not actually take FMLA leave, but merely invoke rights under the FMLA, to recover for retaliation. 582 F.3d at 509 ("We . . . hold that firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee."). The court observed that requiring that an employee actually take FMLA leave as a precondition to recovery would "perversely allow a [sic] employer to limit an FMLA plaintiff's theories of recovery by preemptively firing her." *Id.*

In a subsequent opinion, *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, the Third Circuit specifically noted that *Erdman* does not "necessarily guarantee[] that plaintiffs have an automatic right to claim interference where . . . the claim is so clearly redundant to the retaliation claim." 691 F.3d 294, 312 n.25 (3d Cir. 2012) (observing that "[i]n recent years, several federal courts of appeals have affirmed dismissal of interference claims that . . . were duplicative of the plaintiff's retaliation claims.") (citing cases). The *Lichtenstein* court cited numerous cases supporting the proposition that when a plaintiff's factual premise for FMLA and interference claims is redundant, the court should construe the claims as a retaliation claim. *See, e.g., Lovland v. Emplrs. Mut. Cas. Co.*, 674 F.3d 806, 811-12 (8th Cir. 2012) (affirming district court's conclusion that plaintiff "asserted only . . . retaliation claims because she alleged discrimination that occurred after she took FMLA leave, not denial of, or interference with, her leave.") (internal quotation marks omitted); *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 282-83 (6th Cir. 2012) (holding that the district court was correct to analyze FMLA retaliation and interference claims solely as a retaliation claim on summary judgment motion where "the

---

[7] The precise proposition for which Plaintiff cites *Erdman* is not clearly apparent to the Court, as Plaintiff has failed to explain why, exactly, *Erdman* should compel this Court to deny summary judgment as to her interference claims. The Court, nevertheless, has endeavored to ascertain the specific proposition for which Plaintiff cites *Erdman*.

essence of [the plaintiff's] claim [was] retaliation, not interference with his substantive FMLA rights."); *Atchison v. Sears*, 666 F. Supp. 2d 477, 489 (E.D. Pa. 2009) ("[Plaintiff's] interference claim is identical to his retaliation claim, and premised on the same allegation[s]. . . . He cannot escape the *McDonnell Douglas* analysis to prove his case merely by affixing an 'interference' label to one of his duplicative claims. Thus, [plaintiff's] FMLA violation allegations should be analyzed as a retaliation claim."); *see also Mascioli v. Arby's Rest. Group, Inc.*, 610 F. Supp. 2d 419, 432-33 (W.D. Pa. 2009) (where plaintiff's interference and retaliation claims were "identical," interference claim was denied as moot and summary judgment as to said claim granted in favor of defendant employer) (not cited in *Lichtenstein*).

Just as the claims at issue in *Atchison* and *Mascioli*, the interference and retaliation claims at issue here are redundant. Indeed, the premise of both claims is that Defendant wrongfully terminated Plaintiff when she returned from FMLA leave. As Plaintiff's retaliation and interference claims are duplicative, it is appropriate to dismiss the latter. *See, e.g., Lichtenstein*, 691 F.3d at 312 n.25. Accordingly, Defendant's motion for summary judgment as to Plaintiff's interference claims is granted.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is denied in part, and granted in part. Specifically, Defendant's motion is denied as to Plaintiff's retaliation claims, and is granted as to her interference claims. An appropriate Order follows.

Dated: July 2nd, 2013

JOSE L. LINARES
U.S. DISTRICT JUDGE

18